**Slip Op. 06-52**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

|  |  |
|---|---|
| HYNIX SEMICONDUCTOR, INC., HYNIX SEMICONDUCTOR AMERICA, INC. | |
| Plaintiffs, | Before:   Richard W. Goldberg, Senior Judge |
| v. | |
| UNITED STATES, | Court No. 03-00652 |
| Defendant, | |
| and | **PUBLIC VERSION** |
| INFINEON TECHNOLOGIES, NORTH AMERICA CORP., and MICRON TECHNOLOGY, INC., | |
| Defendant-Intervenors. | |

<u>OPINION</u>

[ITC's affirmative injury determination sustained in part and remanded in part]

Dated: April 13, 2006

<u>Willkie, Farr & Gallagher LLP</u> (<u>James P. Durling</u>, <u>Daniel L. Porter</u>) for Plaintiffs Hynix Semiconductor Inc. and Hynix Semiconductor America Inc.

<u>Peter D. Keisler</u>, Assistant Attorney General; <u>David M. Cohen</u>, Director; <u>Ada Elsie Bosque</u>, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; <u>Neal J. Reynolds</u>, Office of the General Counsel, U.S. International Trade Commission (<u>Mary Jane Alves</u>), for Defendant United States.

<u>Collier, Shannon, Scott, PLLC</u> (<u>Kathleen W. Cannon</u>) for Defendant-Intervenor Infineon Technologies North America Corp.

<u>King & Spalding LLP</u> (<u>Gilbert B. Kaplan</u>, <u>Cris R. Revaz</u>) for Defendant-Intervenor Micron Technology, Inc.

**GOLDBERG, Senior Judge**: In this action, Plaintiffs Hynix Semiconductor Inc. and Hynix Semiconductor America Inc. (together, "**Hynix**") challenge the final affirmative material injury determination made by the United States International Trade Commission ("**ITC**") pursuant to 19 U.S.C. § 1671d(b) with respect to dynamic random access memory semiconductors of one megabit or above ("**DRAMS**"), published under DRAMS and DRAM Modules from Korea, USITC Pub. 3616, Inv. No. 701-TA-431 (Aug. 2003) (Final).[1]  Pursuant to USCIT Rule 56.2, Hynix moves for judgment on the agency record.

Hynix submitted a Memorandum of Law in Support of Plaintiff's Motion for Judgment Upon the Agency Record ("**Pls.' Br.**"), and the ITC submitted a Memorandum in Opposition to Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record ("**Def.'s Br.**").  Micron Technology, Inc. ("**Micron**") submitted a Memorandum of Law in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record ("**Micron's Br.**").

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c).  After due consideration of the parties'

---

[1]  The ITC's final determination report consists of two documents, an explanatory Views of the Commission ("**Views**") and a Final Staff Report.  The Court's citations to both Views and the Final Staff Report reference the confidential versions wherein the relevant data and evidence appear.  A public version of the full ITC report is available at http://hotdocs.usitc.gov/docs/pubs/701_731/pub3616.pdf.

submissions, the administrative record, and all other papers herein, and for the reasons that follow, the Court remands to the ITC for further explanation of the causal nexus between subject imports and the domestic industry's material injury in light of the drop in underlying demand for computer and telecommunications equipment during the period of investigation.  All other aspects of the ITC's final determination are sustained.

## I. <u>STANDARD OF REVIEW</u>

The Court will sustain the ITC's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(B) (1999).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988) (<u>quoting</u> <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).  Moreover, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." <u>Matsushita Elec. Indus. Co. Ltd. v. United States</u>, 750 F.2d 927, 933 (Fed. Cir. 1984) (<u>quoting</u> <u>Consolo v. Fed. Mar. Comm'n</u>, 383 U.S. 607, 620 (1966)).

The reviewing court may not, "even as to matters not requiring expertise[,] displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably

have made a different choice had the matter been before it <u>de novo</u>." <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951). "Fundamentally, in reviewing an injury determination under the [statute], this Court may not weigh the evidence concerning specific factual findings, nor may the Court substitute its judgment for that of the [ITC]." <u>Sprague Elec. Co. v. United States</u>, 2 CIT 302, 310, 529 F. Supp. 676, 682-83 (1981).[2] Such deference is also granted to the ITC regarding its choice of methodology. <u>See</u> <u>Am. Silicon Techs. v. United States</u>, 334 F.3d 1033, 1038 (Fed. Cir. 2003).

## II. <u>DISCUSSION</u>

Under 19 U.S.C. § 1671d(b), the ITC is charged with determining whether a domestic industry is materially injured by reason of unfairly subsidized imports. <u>See</u> 19 U.S.C. § 1671d(b)(1) (1999). There are two components to an affirmative material injury determination: "a finding of present material injury or a threat thereof, and a finding of causation." <u>Chr. Bjelland Seafoods A/S v. United States</u>, 19 CIT 35, 37 (1995); <u>see also</u> 19 U.S.C. § 1671d(b)(1) (1999) ("The [ITC] shall make a final determination of whether an industry in the United States is materially injured . . . <u>by reason of</u> [subject] imports . . .

---

[2]  <u>Sprague</u> addressed the material injury requirement contained in the former Antidumping Act, but the quoted language above is equally applicable to countervailing duty cases. <u>See</u> <u>Am. Spring Wire Corp. v. United States</u>, 8 CIT 20, 22 n.3, 590 F. Supp. 1273, 1276 (1984), <u>aff'd sub nom.</u>, <u>Armco Inc. v. United States</u>, 760 F.2d 249 (Fed. Cir. 1985).

.") (emphasis added). "Material injury" is defined as "harm [to the domestic industry] which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A) (1999). When determining whether subject imports have caused material injury to the domestic industry, the ITC must evaluate three factors: (1) the volume of subject imports; (2) the price effects of subject imports on domestic like products; and (3) the impact of subject imports on the domestic producers of domestic like products. Id. § 1677(7)(B)(i)(I)-(III). In addition, the ITC "may consider such other economic factors as are relevant to the determination . . . ." Id. § 1677(7)(B)(ii).

In this case, the ITC found that the U.S. DRAMS industry had been materially injured by reason of DRAMS imports from the Republic of Korea sold in the United States that the U.S. Department of Commerce found to be subsidized by the Government of Korea ("**subject imports**"). Views at 3. In concluding that a "material injury" existed by reason of the subject imports, the ITC relied on the following findings: the volume of subject imports both absolutely and as a share of apparent domestic consumption and production was significant; there was "evidence of significant underselling and price depression by subject imports"; and "nearly all of the domestic industry's performance indicators [        ] during a time of increasing apparent domestic consumption." Id. at 41. Hynix challenges these findings on several grounds.

**A.    The ITC's Findings Regarding Subject Imports' Increases (1) in Absolute Volume and (2) in Volume Relative to Consumption and Production, Are Supported by Substantial Evidence and Are Otherwise in Accordance with Law.**

In evaluating the volume of imports of merchandise, the ITC must consider whether any increase in volume of the subject imports is "significant."  See 19 U.S.C. § 1677(7)(C)(i) (1999). After its investigation, the ITC determined that "the absolute volume of subject imports and the increase in that volume over the period of investigation relative to production and consumption in the United States is significant."  Views at 29.

Specifically, the ITC found apparent domestic consumption of DRAMS products, measured in billion of bits, increased each year of the period of investigation, from 98.8 million in 2000 to 146.7 million in 2001 and 186.9 million in 2002, and was 55.3 million in interim 2003 compared to 42.8 million in interim 2002. Id. at 30.  The absolute volume of subject imports, in billions of bits, increased from [            ] in 2000 to [            ] in 2001 and [            ] in 2002, and was [            ] in interim 2003 and [            ] in interim 2002.  Id. Concurrently, domestic production, measured in billions of bits, dropped from a level of [            ] in 2000 to [            ] in 2001 before increasing to [            ] in 2002.  Def.'s Br. at 13.  Additionally, the ITC found that the market share of subject imports increased from [    ] percent in 2000 to [    ] percent in 2001 and then decreased to [    ] percent in 2002 and to [    ] percent in the first quarter of 2003.  Views at 30;

Final Staff Report at IV-10.  Domestic producers' market share

declined from [      ] percent in 2000 to [      ] percent in 2001

and subsequently dropped from [      ] percent in 2002 to [      ]

percent in the first quarter of 2003.  Views at 38; Final Staff

Report, App. C, Tab. C-1.[3]

     Hynix does not dispute the ITC's factual findings regarding

the volume of subject imports, but rather contends that the ITC

erred in finding that the volume of subject imports was

significant, claiming that the only proper measure of volume

increase is an increase in market share.  See Pls.' Br. at 10.

Because "total bits supplied and total bits consumed have always

been increasing dramatically," Hynix insists that "examining

relative changes in market shares is the only appropriate means

to assess volume."[4]  Id.

     Hynix asserts that the market share of subject imports

remained small throughout the investigation period, and actually

_____

     [3]  The ITC also found the ratio of total subject imports of
uncased DRAMS compared to U.S. production increased from [      ]
percent in 2000 to [      ] percent in 2001, then declined to
[      ] percent in 2002, "a level that was still [nearly double]
that of 2000 . . . ."  Views at 30.  Compared to U.S. shipments
of DRAMS and DRAM modules, the ratio of subject imports increased
from [      ] percent in 2000 to [      ] percent in 2001 and [      ]
percent in 2002.  Id. n.138.

     [4]  Hynix agrees that volume of bits is the appropriate
metric by which to measure the subject imports.  See Pls.' Br. at
10.  The steady increase in volume was due in part to the
evolving DRAMS technology, which permitted an increasingly
greater density of data bits to be contained on a given DRAMS
unit.  Since the  subject imports were measured in bits and not
units, an increase in bit volume is due in part to technological
developments that enhanced the chip density.

declined at the end of the period.  Id. at 11.  It argues that a

[    ] percent increase in market share between 2000 and 2002 is a

"figurative 'blip' on the radar screen" largely driven by the

domestic industry's shift to servicing growing demand for DRAMS

outside the United States.[5]  Id. at 12.  Hynix argues that such

an increase cannot be deemed significant for the purposes of

volume analysis.

     The Court disagrees on both counts.  First, the statute

provides that an affirmative volume analysis may conclude that

the absolute volume of subject imports, or increases in the

relative subject import volume (i.e., the market share), is

significant.  19 U.S.C. § 1677(7)(C)(i) (1999).  "Any one of

these calculations is sufficient to support a finding of injury

under the statute."  Hyundai Elec. Ind. Co., Ltd. v. United

---

[5]  The [    ] percent increase in market share, according to
Hynix, also partially resulted from the temporary closure of
Hynix's U.S. manufacturing facility, operated by Hynix
Semiconductor Manufacturing America, Inc.  Pls.' Br. at 13.
While the plant was closed for an upgrade, Hynix claims to have
produced and imported the subject imports, in part, to make up
for this lost capacity.  Hynix contends competition in the DRAMS
industry is by brands, and not by country of origin, because
production can be shifted from one country of origin to another
at low cost.  However, section 1677(7) does not permit the ITC to
base its "material injury" determination on a brand name basis.
The statute clearly mandates that the ITC examine the volume of
imports of the "subject merchandise" and whether the volume or
any absolute or relative increase in that volume compared to
"production or consumption in the United States" is significant.
19 U.S.C. § 1677(7)(C)(i) (1999).  This requires the ITC to
examine the domestic industry as a whole, not by brand names,
and, accordingly, the ITC found that subject imports' absolute
and relative increase in volume indicated subject imports'
significance in the U.S. market.

States, 21 CIT 481, 485 (1997); see also Taiwan Semiconductor Indus. Ass'n v. United States, 24 CIT 220, 230, 105 F. Supp. 2d 1363, 1372 (2000) (finding that a significant increase in the absolute volume of imports is sufficient, by itself, to support a finding that the overall volume of imports is significant); Copperweld Corp. v. United States, 12 CIT 148, 167, 682 F. Supp. 552, 570 (1988) (holding that the statute's disjunctive structure signifies a congressional intent to give the agency broad discretion to analyze import volume in the context of the industry concerned).  While it is crucial that the ITC "must analyze the volume and market share data in the context of conditions of competition," especially in industries where subject imports represent a small percentage of market share relative to that held by the domestic industry, "[t]here is no minimum rate of increase in subject import volume or a baseline percentage of market share for subject imports, above which volume will be considered 'significant.'"  Nippon Steel Corp. v. United States, 25 CIT 1415, 1419, 182 F. Supp. 2d 1330, 1335 (2001).  In the final analysis, the ITC must collect data and formulate a reasoned explanation for the significance vel non of volume fluctuations.

Here, the ITC's finding that subject import volume was significant is supported by substantial evidence.  Over the period of investigation, the absolute volume of subject imports [                    ], and because of the substantial degree of

substitutability and the commodity-like properties of DRAMS products, the ITC found that the absolute volume of subject imports was significant during the period.  See Views at 30-31. The presence of an increase in absolute volume of subsidized imports in a market characterized by product fungibility is significant because such evidence tends to prove that purchasers were acquiring subject imports in lieu of domestically produced DRAMS.

While Hynix argues that the total bits supplied and total bits consumed "have always been increasing dramatically," Pls.' Br. at 10 (emphasis omitted), it does not present any alternative explanation as to why the rate of increase in volume of total subject imports accelerated from 2000 to 2001 and then tapered off between 2001 and 2002.  The ITC's reasoning, on the other hand, is discernible, and the record provides substantial evidence in support of the ITC's determination that the [          ] of subject import volume over the period, as considered within the context of the DRAMS industry, is significant.  See Views at 30.  The Court therefore sustains the ITC's determination that the volume of subject imports during the period of investigation was significant.

Second, even if the Court were to agree that a market share analysis is the only appropriate analysis to make in light of the unique characteristics of the industry, the Court would sustain the ITC's determination that the market share increase was

significant over the period.  Hynix's argument that the [    ] percent increase in market share cannot be deemed significant is without merit.  That this increase occurred at a time when domestic market share dropped by approximately [ ] percent weighs heavily in the analysis.  See Final Staff Report, App. C, Tab. C-1.  This is especially true in the DRAMS industry, where producers rely on revenue streams to finance continual investment in new capital equipment as well as research and development ("**R&D**").  Views at 23.  Moreover, the market share fluctuations are made more significant due to the fungibility of the goods in question and the price-sensitive nature of the DRAMS market.  Id. at 25, 31; see also USX Corp. v. United States, 11 CIT 82, 85, 655 F. Supp. 487, 490 (1987) (noting that, in price-sensitive industries that produce fungible products, "'the impact of seemingly small import volumes . . . is magnified in the marketplace'") (quoting Certain Carbon Steel Products from Spain, USITC Pub. 1331 at 16-17, Inv. Nos. 701-TA-155, 157-60, 162 (Dec. 1982) (Final)).  The ITC properly took the price-sensitive nature of the DRAMS market into consideration when determining that the increase in volume relative to consumption was significant over the relevant period, see Views at 31, and the Court therefore sustains that determination.

**B.  The ITC's Finding That the Price Effects of Subject Imports Were Significant Is Supported by Substantial Evidence and Is Otherwise in Accordance with Law.**

In evaluating the price effects of subject imports, the ITC

considers (1) whether "there had been significant price underselling by the imported merchandise" as compared with domestic production; and (2) whether subject imports "otherwise [depress] prices to a significant degree or [prevent] price increases . . . ."  19 U.S.C. § 1677(7)(C)(ii) (1999).  During the investigation, the ITC collected extensive data from domestic DRAMS producers and purchasers regarding DRAMS prices, the volume of sales, and instances of lost sales and revenue to subject imports.  Views at 34; Final Staff Report at V-44 (Tab. V-19).  The ITC examined the pricing for eight different products and compared the monthly weighted-average price of domestic shipments with the monthly weighted-average price of subject imports for each month between January 2000 and March 2003.  Views at 34-35; Final Staff Report, at V-9 to V-41 (Tabs. V-2 to V-18).  Because subject import underselling was consistent, at high margins, and increasing over the period, the ITC found significant underselling by subject imports. Views at 35.  The ITC explained that in commodity-type markets, which adjust quickly to price changes, significant price disparities between suppliers would not usually be expected.  Id.  Moreover, patterns of frequent, sustained high-margin underselling by subject imports were, according to the ITC, especially significant in this industry, and could be expected to have a deleterious effect on domestic prices.  Id.  Therefore, the ITC concluded that "[i]n the absence of significant quantities of [subject imports] competing in the

same product types at relatively low prices, domestic prices would have been substantially higher." Id. at 37.

Hynix does not challenge the data underlying the ITC's weighted-average pricing analysis. Rather, Hynix argues that the ITC should have given considerable weight to a disaggregated brand name analysis, and, by failing to do so, inappropriately relied on its traditional approach of comparing a weighted-average subject import price to a weighted-average domestic price. Pls.' Br. at 15-16. According to Hynix, this weighted-average underselling analysis is much less relevant than a brand name lowest price analysis when analyzing the DRAMS industry because DRAMS are a commodity product with near complete interchangeability among subject imports, domestic production, and non-subject imports. Id. at 16. Moreover, ignoring non-subject imports in this case is particularly inappropriate given that non-subject imports constitute a majority ([  ] percent in 2002) of the supply. Id. Hynix contends that in a commodity market, a supplier that is not recognized as the lowest price leader does not impact market prices, as evidenced by statements of Micron's CEO, as well as surveys in the record indicating that most purchasers were unable to identify any price leader. Id. at 19. Accordingly, Hynix argues, the ITC was incorrect in determining that subject import prices that are below weighted-average domestic prices can still impact the market even if they are not the lowest single price in the market at a given point in

time.  Id.

        Hynix explains that a lowest price analysis illustrates

that: (1) Hynix was the lowest price supplier only [   ] percent

of the time; (2) the frequency of non-subject imports being the

lowest price source grew from [   ] percent to [   ] percent over

the period of investigation; and (3) in the PC OEM channel, the

frequency of subject imports being the lowest price is even

smaller - only [   ] percent of all instances.  Id. at 17.  Hynix

claims that non-subject imports played a critical role in the

DRAMS industry during the period, and employing a brand name

lowest price analysis would have allowed for more adequate

consideration of the importance of non-subject imports.  Id. at

20-21.  Hynix therefore asserts that since subject imports were

at the lowest price only [   ] percent of the time, it was

incorrect for the ITC to blame Hynix for the injury to the

domestic industry when some other supplier was the lowest price

during the period of investigation [   ] percent of the time.  Id.

at 19-20.[6]

        There is no legal requirement that subject imports be the

lowest price product throughout the investigation based on either

a weighted-average pricing analysis or disaggregated analysis.

See Metallverken Nederland B.V. v. United States, 13 CIT 1013,

---

        [6]  Discussion regarding the ITC's consideration of the
relative impact and effect of non-subject imports is also
discussed below in Part II.C.2, along with other possible factors
that may have led to the domestic industry's material injury.

1024, 728 F. Supp. 730, 739 (1989) ("Instances of overselling do not preclude the [ITC] from finding significant or pervasive underselling."). Rather, as noted above in Part I, the ITC has broad discretion in selecting the appropriate analysis or methodology to apply to its review of subject import price effects. On other occasions, the U.S. Court of International Trade ("**CIT**") has specifically held that the ITC possesses "broad discretion" in selecting methodologies to analyze price effects in particular. See, e.g., U.S. Steel Group v. United States, 18 CIT 1190, 1218, 873 F. Supp. 673, 699 (1994); Mitsubishi Materials Corp. v. United States, 17 CIT 301, 318, 820 F. Supp. 608, 624 (1993).

In this particular case, the ITC's choice of a weighted-average pricing methodology is reasonable and warrants deference because: (1) the ITC has routinely applied the weighted-average pricing analysis in antidumping and countervailing duty investigations, including other cases involving commodity-like products; (2) other CIT cases have previously sustained the ITC's use of weighted-average pricing methodology; and (3) the ITC reasonably concluded that a disaggregated brand name analysis does not fulfill the ITC's statutory purpose to consider the industry as a whole.

First, the ITC has applied the weighted-average pricing analysis in previous DRAMS investigations. See, e.g., Certain Ceramic Station Post Insulators from Japan, USITC Pub. 3655 at 15

n.104, Inv. No. 731-TA-1023 (Dec. 2003) (Final); <u>Dynamic Random Access Memory Semiconductors of One Megabit and Above from Taiwan</u>, USITC Pub. 3256 at 40-42, Inv. No. 731-TA-811 (Dec. 1999) (Final); <u>DRAMs of One Megabit and Above from the Republic of Korea</u>, USITC Pub. 2629 at 28-29, I-92, I-96, Inv. No. 731-TA-56 (May 1993) (Final); <u>64K Dynamic Random Access Memory Semiconductors from Japan</u>, USITC Pub. 1862 at 19, A-47, A-51, Inv. No. 731-TA-270 (June 1986) (Final).  Additionally, the ITC has similarly applied its weighted-average pricing analysis in other cases involving commodity-like products, and the ITC has never found that the price-sensitive nature of those markets invalidates or negates the results of a weighted-average pricing methodology.  <u>See, e.g.</u>, <u>Ferrovanadium from China and South Africa</u>, USITC Pub. 3570 at 19, 23, Inv. Nos. 731-TA-986-87 (Jan. 2003) (Final); <u>Carbon and Certain Alloy Steel Wire Rod from Brazil, Canada, Germany, Indonesia, Mexico, Moldova, Trinidad and Tobago, Turkey, and Ukraine</u>, USITC Pub. 3546 at 37-38, Inv. Nos. 701-TA-417-421 and 731-TA-953-54, 956-59, 961-62 (Oct. 2002) (Final); <u>Individually Quick Frozen Red Raspberries from Chile</u>, USITC Pub. 3524 at 13-14, Inv. No. 731-TA-948 (June 2002) (Final).

Second, other CIT cases have previously sustained the ITC's use of a weighted-average pricing methodology.  <u>See, e.g.</u>, <u>Nippon Steel Corp. v. United States</u>, 19 CIT 450, 466 (1995) (holding that the identity of the price leader is irrelevant if subject

imports undersell the domestic industry on a weighted-average basis); U.S. Steel, 18 CIT at 1220, 873 F. Supp. at 700 ("The court thus upholds the [ITC]'s application here of a weighted average unit pricing methodology in [its] analysis of pricing data.").

Third, the ITC explained that a disaggregated brand name lowest price analysis does not fulfill its statutory purpose to consider the industry as a whole. Views at 35. According to the ITC, subject import prices that are "below weighted average domestic prices can impact the market even when they are not the lowest single price in the market at a given point in time." Id. The ITC noted, in Certain Carbon Steel Products from Spain, that in markets that are price sensitive and involve basic commodity products, "the mere presence of an offer from an importer . . . at a lower price can have a discernible impact." Certain Carbon Steel Products from Spain, USITC Pub. 1331 at 21. "Such offers affect the ability of domestic . . . producers to price competitively, to cover fixed costs, and to generate funds for needed capital improvements." Id.

In this case, the ITC examined the condition of the market, as well as the effect of subject imports, in concluding that "significant price underselling by subject imports . . . depressed prices to a significant degree." Views at 37. Moreover, in recognition of the inherent conditions of competition in the DRAMS industry, in which prices can change

frequently, the ITC did collect monthly pricing data by brand name.  Id. at 35; Final Staff Report at V-9 to V-44 (Tabs. V-2 to V-17).  The ITC determined that it was far from obvious that the brand name analysis led to a different conclusion than the traditional weighted-average pricing analysis.  Views at 35-36.  The ITC found that even using the brand name, lowest price methodology, there are significant and demonstrated price effects of subject imports because subject imports were the lowest-price product in the U.S. market [    ] percent of the time, "more often than DRAMS products from any other source."  Id. at 36.  The ITC explained that DRAMS industry practices (such as most-favored-customer clauses, best-price clauses, and other less formal arrangements) and the quick dissemination of information demonstrate that low prices had an almost immediate impact on the marketplace.  Id. at 33 n.148; Def.'s Br. at 22.

Both the lowest price and weighted-average methodologies have advantages and disadvantages.  Hynix, however, has not demonstrated that the ITC's choice of methodology was an abuse of discretion.  The Court therefore sustains the ITC's application of a weighted-average pricing analysis in examining the effect of subject imports on the domestic industry.  Accord U.S. Steel Group, 18 CIT at 1220, 873 F. Supp. at 700.

C.    The ITC's Impact Analysis Is Sustained in Part and Remanded in Part.

Once the ITC has determined that both the volume and price

effects of subject imports are significant, the next step in the inquiry is to assess "the impact of imports of such merchandise on domestic producers of domestic like products . . . ."  19 U.S.C. § 1677(7)(B)(i)(III) (1999).  The ITC concluded that "subject imports are having a significant adverse impact on the domestic industry producing DRAM products."  Views at 41.  Hynix challenges this finding by raising three arguments.  First, Hynix claims the ITC failed to take into account the importance of the business cycle in the DRAMS industry.  Pls.' Br. at 25-27. Second, it faults the ITC for ignoring special indicia of industry success by which the domestic industry allegedly gauged its own financial condition.  Id. at 27-31.  In its final argument, Hynix presents three other causes, unrelated to the subject imports, that the ITC purportedly failed to evaluate prior to concluding that subject imports were responsible for the material injury.  Id. at 31-49

1. **The ITC's Analysis of the Conditions of the Domestic Industry Properly Considered the Business Cycle and the Conditions of Competition That Are Distinctive to the Industry.**

The Court will address Hynix's first two arguments together, since they both raise issues relating to the ITC's contextual inquiry into the business cycle and competitive conditions.  As part of its impact analysis, the ITC is required to "evaluate all relevant economic factors which have a bearing on the state of the industry in the United States," and must do so "within the

context of the business cycle and conditions of competition that
are distinctive to the affected industry." 19 U.S.C. §
1677(7)(C)(iii) (1999). "Relevant economic factors" include, but
are not limited to:

> (I) actual and potential decline in output, sales,
> market share, profits, productivity, return on
> investments, and utilization of capacity,
>
> (II) factors affecting domestic prices, [and]
>
> (III) actual and potential negative effects on cash
> flow, inventories, employment, wages, growth, ability
> to raise capital, and investment[.]

Id. The ITC is provided with flexibility to determine the
significance of any particular factor or of the various factors
affecting an industry in each particular case. See Am. Spring
Wire Corp., 8 CIT at 23, 590 F. Supp. at 1277.

> ### a. The ITC's Treatment of the "Boom/Bust" Phenomenon in the Impact Analysis Properly Considered the Context of the Business Cycle and Conditions of Competition in the DRAMS Market.

In coming to its conclusion that the subject imports caused
a material injury to the domestic industry, the ITC examined the
record evidence within the context of the business cycle and
conditions of competition that are distinctive to the industry.
The ITC's report appropriately discussed the unique business
conditions of the DRAMS industry in the section entitled
Conditions of Competition and the Business Cycle, which is
divided into three subsections entitled Demand Considerations,
Supply Considerations, and Additional Considerations. See Views

at 21-29.  Within these sections, the ITC examined specific conditions of the DRAMS industry, including the "boom/bust" business cycle and its causes, the product life cycle and "learning curve," and the commodity-like properties of the DRAMS market.  See id.

Hynix argues that the ITC failed to consider the impact of the "notorious boom/bust" pattern of the DRAMS business cycle in a discernible fashion, thereby failing to satisfy its statutory obligation under 19 U.S.C. § 1677(7)(C)(iii).[7]  See Pls.' Br. at 25.   Hynix admits that "the ITC acknowledged [the existence of] the boom-bust business cycle," but contends that the ITC nevertheless failed to consider the business cycle when analyzing the causes of, and the factors affecting, the deterioration of the domestic industry's financial condition over the period of investigation.  Id. at 26.  Hynix's argument relies on two points: first, the period of investigation correlates with the period when the industry went from the "top of the boom to the trough of the bust"; and second, the ITC failed to reference the term "business cycle" in the entire "Impact" section even though the downturn of the business cycle was represented by an

_____

[7]  The "boom/bust" business cycle results from two factors: (1) the massive, though sporadic, capital outlays that DRAMS producers must make to invest in new capital equipment; and (2) the short product life cycles that result in diminishing returns on these investments.  The alternating "boom" and "bust" periods are attributed to the time lags involved in adding this new capacity.  See Views at 23.

"unprecedented drop in demand" in 2001.  Id. at 26-27.

In this case, and contrary to Hynix's position, the ITC patently did address the important conditions of competition and business cycle of the DRAMS market.  To insist that the ITC shirks its statutory duty if it fails to include the term "business cycle" in its analysis is to engage in a formalism that does not befit the contextual nature of an impact analysis.  The ITC is equipped with substantial discretion in how to report its findings; as other courts have said, the ITC need not lay out its analysis in some prescribed way, as there is no "magic word analysis."  See NEC Corp. v. Dep't of Commerce, 22 CIT 1108, 1123 n.9, 36 F. Supp. 2d 380, 393 (1998) (Pogue, J.) ("It is a well recognized principle of administrative law, that [a] court may uphold [an agency's] decision of less than ideal clarity if the agency's path may reasonably be discerned.") (quotation marks omitted).

The ITC satisfied its statutory obligation under 19 U.S.C. § 1677(7)(C)(iii) because it incorporated its findings regarding the industry's conditions of competition and business cycle into its impact analysis.  For example, in its analysis of subject import volume, the ITC specifically discussed domestic consumption, the presence of other suppliers in the U.S. market, and the "commodity-like nature of domestic and subject imported DRAM[S] products."  Views at 31.  In its price effects analysis, the ITC discussed, inter alia, the following factors: the effect

of global pricing on the industry, the high degree of
substitutability of DRAMS products, the overlapping customers and
channels of distribution of subject and domestic DRAMS products,
the presence of other supply sources in the U.S. market,
increases in demand but at slower rates, and the importance of
price in the industry.  See id. at 32-38.  In its analysis of the
subject imports' impact on the domestic industry, the ITC
incorporated findings regarding capacity and production
increases, idled equipment, deferred upgrades and expansions, the
capital-intensive nature of the industry, severe price declines,
increasing demand, and the presence of other suppliers in the
U.S. market.  Id. at 38-41.  Thus, the record presents
substantial evidence that the ITC examined both the business
cycle and the unique conditions of the domestic industry in
determining the impact of subject imports.  Weighing the ample
evidence, the ITC found that "the operation of the DRAM[S]
business cycle and product life cycles," standing alone, could
not explain the "unprecedented severity of the price declines
that occurred from 2000 to 2001 and persisted through 2002."  Id.
at 36.  Accordingly, the ITC's impact analysis properly evaluated
all relevant economic factors within the proper contexts, and
thereby complied with 19 U.S.C. § 1677(7)(C)(iii).[8]

_____

    [8]  The Court's conclusion that the ITC's treatment of the
business cycle and the "boom/bust" phenomenon was sufficient also
disposes of Hynix's complaint that the ITC ignored rebuttal
evidence that Hynix's underselling was explained by its

### b. The ITC Did Not Err By Failing to Take Into Account Any Special Indicia of Industry Success Distinctive to the DRAMS Industry.

The ITC's determination that subject imports contributed materially to the steep price declines that occurred over the period of investigation properly considered the conditions of competition distinctive to the DRAMS industry.  According to the ITC, declining prices for DRAMS were the primary reason for the domestic industry's large operating losses and the drastic deterioration of the industry's condition since 2000.  Views at 40.  The ITC found that: (1) The domestic industry's operating income fell from a positive $2.7 billion in 2000 into a loss position for the remainder of the period of investigation, id. at 39; (2) Capital expenditures dropped from $1.8 billion in 2000 to $1.6 billion in 2001 and [                         ], with [

], id. at 40; (3) Of the eight domestic companies outside the Hynix family producing DRAMS in 2000, only four remained at the end of the period of investigation, and all four survivors were [

].  See Final Staff Report at III-1, III-12 (Tab. III-4).

Nevertheless, Hynix contends that the record demonstrates

---

relatively less significant capacity-increasing capital investments during the period of investigation.  See Pls.' Br. at 43-47.  That argument is a reiteration of the "boom/bust" argument that the ITC properly considered, and the ITC's response is supported by substantial evidence.

the overall salubriousness of the domestic industry, at least
when examined through the industry's accepted definition of
success.  See Pls.' Br. at 28.  Hynix claims the factors the ITC
focused  on – capacity utilization, production, commercial
shipments, and operating profit – differed from those by which
"the U.S. producers themselves wanted the world to evaluate their
financial condition."  Id. at 27.  Essentially, Hynix argues that
any treatment of the conditions of competition in the DRAMS
industry must analyze the domestic industry's self-defined
criteria of success.

The domestic industry's definition of success, as derived
from Micron's 2001 Year In Review prospectus and from a statement
from Micron's CEO to a magazine, includes: (1) the ability to
continue capital spending; (2) the ability to continue R&D
efforts; (3) a strong market share to spread out costs; (4)
strong cash flows to fund investments; and (5) access to capital
markets to supplement cash flow.  See id. at 28.  Considered as a
whole, Hynix contends the record reflects strong capital and R&D
spending, all funded by cash flows and access to capital markets,
thus demonstrating the overall strength of the domestic industry.
Id.  In terms of these factors, Hynix concludes, the record
reflects a well-positioned domestic industry and a well-
positioned petitioner.  Id.

As discussed above, 19 U.S.C. § 1677(7)(C)(iii) propounds a
non-exhaustive list of "relevant economic factors" the ITC must

consider in its impact analysis.  See 19 U.S.C. § 1677(7)(C)(iii)
(1999).  Thus, Hynix's argument that the ITC should have looked
at only five factors is flatly contradicted by the language of
the statute.  Moreover, as the ITC points out, even employing the
five factors preferred by Hynix, it is still clear that the
health of the domestic industry was declining.  For instance, the
domestic industry's capital expenditures declined, its market
share declined, its cash flow declined precipitously from [
              ] in 2000 to [                        ] in 2001
before recovering slightly in 2002, and domestic producers'
credit ratings were lowered.  See Views at 39-40; Final Staff
Report at VI-2 (Tab. VI-1).  Furthermore, the ITC discussed,
inter alia, capacity and production increases, idled equipment,
deferred upgrades and expansions, the capital-intensive nature of
the industry, severe price declines, and the presence of other
suppliers in the U.S. market in its analysis of subject imports'
impact.  See Views at 39-40.  As demonstrated by the above
considerations, the ITC satisfied its statutory obligation under
19 U.S.C. § 1677(7)(C)(iii) to examine the conditions of
competition distinctive to the industry.

     **2.   The ITC's Evaluation of Other Alternative Causes
          Contributing to Material Injury is Sustained in Part
          and Remanded in Part.**

     Hynix argues that the ITC disregarded, without substantial
evidence, the impact of three other factors contributing to the
infirm state of the domestic DRAMS industry: (1) the presence of

non-subject imports, (2) Micron's technological and production difficulties, and (3) the unprecedented drop in underlying demand for computer and telecommunications equipment.  According to Hynix, these other factors predominate any analysis of causation of the domestic industry's woes, and the role of the subject imports – when cast against the backdrop of these other "relevant economic factors" – emerges as merely tangential.  For the reasons below, the Court upholds, as being supported by substantial evidence, the ITC's determination that neither non-subject imports nor Micron's technological and production difficulties were primary causes of the domestic industry's material injury.  However, this Court remands to the ITC for further clarification and explanation of the causal nexus between the subject imports and the material injury to the domestic DRAMS industry in light of the unprecedented drop in underlying demand for computer and telecommunications equipment during the period of investigation.

As noted above, the ITC's impact analysis "shall evaluate all relevant economic factors which have a bearing on the state of the industry in the United States[.]"  19 U.S.C. § 1677(7)(C) (1999).  This subsection directs the ITC to evaluate other possible concurrent causes that contribute to, or are primarily responsible for, the material injury to the domestic industry.  By mandating consideration of "all relevant economic factors," the statute prevents the ITC from attributing to subject imports

an injury whose cause lies elsewhere.

The requirement to look to "all relevant economic factors" is inextricably intertwined with the ITC's causation inquiry.  As noted above, any affirmative material injury determination by the ITC must be supported by (1) an actual, present material injury and (2) a finding that the material injury is "by reason of" subject imports.  See 19 U.S.C. § 1671d(b)(1) (1999); see also Gerald Metals, Inc. v. United States, 132 F.3d 716, 720 (Fed. Cir. 1997) ("[The] statute mandates a showing of causal – not merely temporal – connection between the [subject imports] and the material injury."); U.S. Steel Group v. United States, 96 F.3d 1352, 1358 (Fed. Cir. 1996) ("[T]o claim that the temporal link between these events proves that they are causally related is simply to repeat the ancient fallacy: post hoc ergo propter hoc.") (emphasis omitted).  Where, as here, the ITC has already established a nexus between the subject imports and the domestic industry's injury, the impact analysis must broaden to evaluate competing causes in order to assess whether subject imports are a mere ancillary cause of the injury, and therefore not within the purview of the statute.

An importer does not escape countervailing duties by pointing to "some tangential or minor cause unrelated to the [subject] goods that contributed to the harmful effects on domestic market prices."  Gerald Metals, 132 F.3d at 722.  The converse of that proposition is equally true: the ITC may not

satisfy its burden of proof if subject imports contributed only minimally to the injury.  See id.; see also Taiwan Semiconductor Indus. Ass'n v. United States, 23 CIT 410, 416, 59 F. Supp. 2d 1324, 1331 (1999) (explaining that other causes of injury can have "such a predominant effect in producing the harm as to . . . prevent the [subject] imports from being a material factor") (quotation marks omitted) (alteration in original).

In Gerald Metals, the U.S. Court of Appeals for the Federal Circuit ("**Federal Circuit**") overruled the CIT affirmance of an ITC determination that Russian and Ukrainian magnesium producers were injuring domestic producers by dumping magnesium in the U.S. market.  According to the panel, the CIT's causation inquiry was inadequate for its failure to consider the large excess volumes of fair value Russian magnesium imports that, according to the appellant, were present in the market as well.  The panel held that it was not enough for the CIT to find any minimal contribution to the domestic industry's material injury.  Given the large volume of non-dumped magnesium imports, the Gerald Metals court found that the record did "not show that [the subject] imports of pure magnesium from Ukraine were the reason for the harmful effects to the domestic magnesium industry."  Id. at 722-23.  Gerald Metals impliedly instructs the ITC to inquire whether subject imports are a mere de minimis cause of a material injury to domestic industries, especially where the producer of the subject goods claims another cause predominates.

The Federal Circuit further clarified the causation inquiry in <u>Nippon Steel Corp. v. ITC</u>, explaining that "an affirmative material-injury determination under the statute requires no more than a substantial-factor showing." 345 F.3d 1379, 1381 (Fed. Cir. 2003). Accordingly, subject imports "need not be the sole or principal cause of injury. . . . [so] long as [their] effects are not merely incidental, tangential or trivial . . . ." <u>Id.</u>

The Federal Circuit, in affirming the CIT's <u>Taiwan Semiconductor</u> case, provided the following instructions for the ITC regarding causation: "[T]he [ITC] need not isolate the injury caused by other factors from injury caused by unfair imports. . . . <u>Rather, the [ITC] must examine other factors to ensure that it is not attributing injury from other sources to the subject imports</u>." <u>Taiwan Semiconductor Indus. Ass'n v. ITC</u>, 266 F.3d 1339, 1345 (Fed. Cir. 2001) (<u>quoting</u> H.R. Doc. No. 103-316, vol. 1, at 852) (alteration in original).[9] The ITC is charged with the burden of an earnest investigation into whether other factors render the subject imports a tangential, de minimis cause of the domestic industry's material injury. An affirmative material injury determination does not rest on substantial evidence when the ITC fails to analyze compelling arguments that purport to

---

[9] The <u>Taiwan Semiconductor</u> case, which followed the passage of the Statement of Administrative Action for the Uruguay Round Agreements Act, Pub. L. No. 103-465, tit. II, 108 Stat. 4809 (1994), held that the <u>Gerald Metals</u> causation holding, though regarding law that had been superceded, applied equally to the newly passed act. <u>See</u> <u>Taiwan Semiconductor</u>, 266 F.3d at 1345.

demonstrate the comparatively marginal role of subject imports in causing that injury.

> ### a.   The ITC's Impact Analysis Properly Concluded That the Presence of Non-Subject Imports Did Not Prevent the Subject Imports from Being a Material Cause of Injury to the Domestic DRAMS Industry.

Hynix argues that the ITC improperly dismissed the substantial data on the adverse effects of non-subject imports. See Pls.' Br. at 33-34.  Hynix contends that non-subject imports must be examined because DRAMS are a commodity market and generally interchangeable, and the volume of non-subject imports, in absolute terms, was much larger than subject imports during the period of investigation.  Id. at 33.  By not examining the effects of non-subject imports, the ITC, according to Hynix, failed to satisfy its statutory obligations to provide substantial evidence supporting its conclusion that "'subject imports . . . were large enough and low-priced enough to have a significant impact' and that this was so 'regardless of the adverse effects of [sic] caused by non-subject imports' . . . ." Id. at 37 (quoting Views at 40-41).

The ITC addressed the role of non-subject imports on numerous occasions in its report, see Views at 24-25, 31, 37, 40-41, and its conclusion that non-subject imports did not prevent subject imports from being a material cause of injury is supported by substantial evidence.  The ITC noted that, during the period of investigation, non-subject imports in the U.S.

market were present at higher absolute volumes than subject
imports, and that non-subject imports increased market share "by
a substantially larger amount than subject imports." Id. at 31.
Even though "[n]on-subject imports were responsible for the bulk
of the market share lost by domestic producers during the period
of investigation[,]" id. at 40, the ITC maintained that the
effect of non-subject imports was not so significant as to render
subject imports a mere ancillary and tangential cause of the
domestic industry's material injury.  In support of its
conclusion the ITC presented two reasons: first, a significant
portion of non-subject imports were specialty products for which
domestic producers had no significant competing production during
the period of investigation; and second, even those non-subject
imports consisting of substitutable products did not have the
price effects that subject imports did during the period of
investigation.  Id. at 37, 40.

The ITC correctly noted that not all of the non-subject
imports were readily substitutable with domestic products.  Seven
of the fifteen non-subject importers that responded to the ITC's
questionnaire maintained that they sold, on occasion, Rambus
DRAMS and non-standard, non-substitutable DRAM modules.  See
Final Staff Report at II-13.  The non-standard or specialty DRAMS
or DRAM modules imported by some of those importers amounted to
nearly [          ] of their total U.S. sales of non-subject
imports.  Id.

Moreover, and most significantly, the ITC found the frequency of underselling by non-subject imports was lower than, and increased at a lower rate than, the underselling frequency of subject imports during the period of investigation.  Views at 37. Thus, the ITC reasonably found that the more limited substitutability of non-subject imports, coupled with the fact that non-subject imports undersold domestic DRAMS products at a lower frequency than subject imports did, indicated that non-subject imports had less impact than their absolute and relative volumes might otherwise have indicated.  The above-mentioned findings provided substantial evidence for the ITC's conclusion that non-subject imports did not have such a predominant effect in producing harm as to prevent the subject imports from being a material factor.

> **b.    The ITC's Impact Analysis Properly Concluded That the Effect of Micron's Difficulties on Price Declines Did Not Prevent Subject Imports from Being a Material Cause of Injury to the Domestic Industry.**

Hynix argues that the record evidence demonstrates that technological and production difficulties were an admitted cause of Micron's poor financial performance and that the ITC ignored this information when analyzing other factors affecting the domestic industry.  See Pls.' Br. at 47.  Hynix points to the acknowledged production difficulties ensuing from Micron's risky investment in 0.11 micron technology in 2002, just before the market strengthened for DRAMS products based on the 0.13

geometry.  Id.  According to Hynix, since Micron accounted for

[    ] of the 2002 domestic industry production and sales,

Micron's admitted mistakes explain [    ] of the harm experienced

by the domestic industry.  Id. at 49.

The ITC's position was that whatever difficulties Micron

experienced, there was a sweeping downturn in the U.S. DRAMS

industry, the causes for which could not be attributed to the

poor decision-making of one firm, no matter how large.  See Views

at 39 n.177.  Under section § 1677(7)(B)(ii), the ITC "shall

evaluate all relevant economic factors" that may be relevant to

its determination of causation.  19 U.S.C. § 1677(7)(C)(iii)

(1999) (emphasis added).  Applying the logic of the Federal

Circuit's Taiwan Semiconductor case, the ITC need not isolate the

injury caused by Micron's admitted business difficulties from

injury caused by unfair imports, and apportion relative amounts

of causation as a jury in a comparative negligence case.  Here,

the ITC complied with its statutory obligation by evaluating the

effect of Micron's difficulties on the U.S. market's downturn,

and by ultimately concluding that notwithstanding Micron's

admitted failures, subject imports contributed to the material

injury in a legally significant way.

> c.   *The ITC Must Explain Further the Effect of the Underlying Drop in Demand for Computer and Telecommunications Equipment.*

Hynix argues that by failing to discuss the unprecedented

drop in underlying demand for end-use products (specifically,

computer and telecommunications equipment), the ITC improperly ignored a key factor affecting DRAMS pricing during the period of investigation.[10]  See Pls.' Br. at 38.  According to Hynix, as the demand for underlying information technology downstream products decreased, the DRAMS demand growth rate slowed, and the DRAMS industry suffered a derivative injury.

Hynix contends that the unprecedented drop in demand in the downstream industries over the period of investigation predominates any discussion of the source of the domestic industry's doldrums.  It calls the Court's attention to industry characteristics discussed above, in particular the constantly increasing supply and demand of the DRAMS industry.  While output growth continued unabated, Hynix suggests that demand growth slowed on account of declining demand of certain end-use products.  Furthermore, Hynix claims the record illustrates that demand plays a crucial role in determining DRAMS prices and that subject imports did not affect the level of demand.  Id. at 40.  As such, according to Hynix, the ITC should have distinguished the domestic industry's injury that may have been caused by subject imports from the harm caused by this drop in underlying demand.  See id. at 40-43.

---

[10]  This alleged failure is distinguishable from the treatment of the "boom/bust" phenomenon discussed above, because the drop in demand for downstream products occasioned an unanticipated drop in demand for the DRAMS that are used in those products, and thus was a non-cyclical event.

The record demonstrates that 2001 was the first year in history in which the number of personal computers sold declined rather than increased. Views at 36. The record also shows that the demand for DRAMS "is derived from and driven by the demand for end-use products such as computers and peripheral equipment, communications equipment, and game consoles." Id. at 21. The ITC acknowledged that the slowing growth of apparent U.S. consumption of DRAMS products in the latter portion of the period of investigation may have been due in part to a decline in the quantity of personal computers sold, noting that questionnaire respondents cited a slump in the telecommunications and network industry and a general recession as other possible reasons. Id. at 36; Def.'s Br. at 43. Nevertheless, the ITC concluded that "[w]hile slowing demand played some role [in the price deflation], together with the operation of the DRAM[S] business cycle and product life cycles, the unprecedented severity of the price declines that occurred from 2000 to 2001 and persisted through 2002 indicates that supplier competition was an important factor." Views at 36.

While the ITC need not isolate the injury caused by the drop in underlying demand, once acknowledging its potential impact, the ITC must examine the effect of underlying demand to ensure that it is not attributing an injury caused by the demand drop to subject imports. See Taiwan Semiconductor, 266 F.3d at 1345. The ITC does not satisfy its burden of examining other factors,

and ensuring that it is not attributing injury from other sources to subject imports, by simply noting a potential factor and issuing a conclusory assertion that such a factor did or did not play a major role in causing a material injury.  See Consol. Edison Co., 305 U.S. at 229 ("Substantial evidence . . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.").

The ITC's finding that slowing demand growth was not a significant cause of price deflation was based on a single statement that price movements in the DRAMS market do not correlate with DRAMS market growth.  See Views at 36 ("Historically, there appears to be no clear correlation between growth of the DRAM[S] market and price movements.").  This statement was supported with the single observation, in a footnote, that "1996 to 1998 saw rapid DRAM[S] output growth as well as large price declines."  Id. at 36 n.163 (citing Micron's Br., App. (Tab 12) (Micron's Pre-Hearing Br. Ex. 6) (documenting [  ] percent annual output growth accompanied by annual price declines of over [  ] percent)).

However, it is unclear why data related to output growth should be interpreted as illustrating demand growth, especially in light of the ITC's recognition of the chronic disequilibrium between supply and demand in the DRAMS industry.  See id. at 23. The ITC does not explain at all how output numbers can be used to elucidate the effect of demand fluctuations.  Of course,

increasing output may under some circumstances result from increasing demand.  However, the ITC makes no effort to explain the nexus between the cited output numbers and the movement, if any, of demand in the DRAMS industry during the period of 1996 to 1998.

Alternate explanations for the data exist that do not lead to a conclusion that demand and price are unrelated.  For example, a failure by DRAMS producers to forecast a drop in demand for DRAMS end-use products could result in overproduction, and explain the simultaneous high output growth and price deflation.  In fact, holding constant the rate of output growth, attenuated demand growth would almost certainly catalyze a downward price movement.

Moreover, even assuming arguendo a positive correlation between increasing output growth and increasing demand growth, the Court is unable to discern the path by which the ITC ruled out alternate explanations for the cited data.  For instance, high output growth rates and falling prices could indicate technological advancements that lead to decreased unit costs.  Such a development would similarly result in increased output and reductions in price, but in no way would evidence a non-correlative relationship between demand and price.  The ITC's failure to consider this alternative explanation for the output-price data is even more curious in light of the recognized relation between technology and price in the DRAMS industry:

"Largely because of the perpetual improvements in production efficiencies experienced by this industry, prices are usually declining."  Views at 25.

The record contains data showing that as U.S. consumption growth decreased from 2000-2002, prices fell.  See Final Staff Report, App. C, Tab. C-1 (documenting a growth rate of [     ] percent from 2000 to 2001, and a growth rate of [     ] percent from 2001 to 2002); Micron's Prehearing Br., Ex. 6 (documenting a price decline of [     ] percent from 2000 to 2001, and a price decline of [     ] percent from 2001 to 2002).  Since domestic consumption is a more common proxy for demand than output,[11] this evidence suggests a contrary conclusion: that price and demand indeed are correlated.

At this point, the Court is unable to consider the output growth – price deflation relationship from 1996 to 1998 to be persuasive evidence of a lack of correlation between demand and price.  To borrow a phrase from courtroom practice, the ITC has not laid an adequate foundation to convince the Court that its proffered evidence proves what the ITC claims it proves.  To sustain this portion of the ITC's determination would render the Court's review little more than a perfunctory rubber stamp.  Cf.

---

[11]   On other occasions the ITC has referred to measuring demand by apparent consumption (actual shipments plus captive consumption) as its "usual practice."  See, e.g., DRAMs and DRAM Modules from Korea, USITC Pub. 3839 at 10, Inv. No. 701-TA-431 (Feb. 2006) (Section 129 Consistency Determination).

Colorado Interstate Gas Co. v. Fed. Power Comm'n, 324 U.S. 581,

595 (1945). Accordingly, that issue is remanded to the ITC for

further explanation.

### III. CONCLUSIONS

In light of the foregoing analysis, the Court remands to the

ITC for further consideration of the causal nexus between the

subject imports and the material injury to the domestic DRAMS

industry in light of the unprecedented drop in underlying demand

from 2001 to 2002.[12] Specifically, the ITC must explain, if it is

_____

[12] While this case was stayed pending the adjudication of
Hynix's challenge to the Department of Commerce's determination
that the Korean semiconductor industry was illegally subsidized,
a World Trade Organization ("**WTO**") panel, sitting in review of
the same DRAMS countervailing duty order, pointed out the same
deficiencies discussed in Part II.C.2.c of this opinion. The WTO
panel ultimately held that the ITC's final determination
contravened Article 15.5 of the Subsidies and Countervailing
Measures Agreement. See Panel Report, United States –
Countervailing Duty Investigation on Dynamic Random Access Memory
Semiconductors (DRAMS) from Korea, WT/DS296/R (Feb. 21, 2005).
Following the issuance of the panel report, the United States
Trade Representative requested that the ITC, pursuant to 19
U.S.C. § 3538, bring its affirmative injury determination in
compliance with the WTO panel's report. The consistency
determination that followed addressed the panel's concerns about
the ITC's attribution of injury to subject imports. While the
consistency determination is not part of the record in this case,
the Court has reviewed it. In the interest of expediting this
litigation, the Court advises the ITC that a simple reiteration
of that determination on remand would almost certainly fall short
of the substantial evidence required in this case. The Court's
review of the consistency determination is preliminary, but
inasmuch as the ITC addresses the decrease in demand growth in
isolation from the other conditions of competition (in
particular, the "boom/bust" phenomenon), that determination fails
to address the Court's concern that the ITC has not explained how
the slowing of demand growth did not cause the domestic
industry's problems. Any analysis leading to that conclusion
must account for the actual economic state of the industry during

able, why the 1996-1998 data indicating a negative correlation between output and price is evidence that demand and price are unrelated in the DRAMS industry.  If the ITC is unable to provide such an explanation, it must either (1) point to other record evidence that shows the drop in underlying demand was not a predominant and legally significant cause of the domestic industry's problems; or (2) conduct further investigations to determine the effect of the drop in underlying demand.  All other aspects of the ITC's affirmative material injury determination are sustained.  A separate order will issue in accordance with these conclusions.


                                        /s/ Richard W. Goldberg
                                        **Richard W. Goldberg**
                                        **Senior Judge**


**Dated:**        **April 13, 2006**
                  **New York, NY**

---

the period of investigation.  The consistency determination arose in a different context, and the ITC is surely more familiar with the dispute as framed in the WTO litigation.  However, if the ITC is to respond effectively to the Court's concerns in this case, it must discuss the effect of demand on price, if any, in the context of the chronic disequilibrium between supply and demand.