**Slip Op. 08-125**

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CELANESE CHEMICALS LTD., | : |
| *Plaintiff*, | : |
| v. | : |
| UNITED STATES, | :     Court No. 04-00594 |
| *Defendant*, | **PUBLIC** |
| | : |
| and | |
| | : |
| E.I. DUPONT DE NEMOURS & CO. and CHANG CHUN PETROCHEMICAL CO., LTD., | : |
| *Defendant-Intervenors*. | : |

[International Trade Commission's Affirmative Preliminary Determination on remand sustained.]

Dated: November 19, 2008

Gibson, Dunn & Crutcher LLP (Daniel J. Plaine, Gracia M. Berg, and Oleh Vretsona), for Plaintiff.

James M. Lyons, General Counsel, Neal J. Reynolds, Assistant General Counsel for Litigation, U.S. International Trade Commission (Mary Jane Alves); for Defendant.

Crowell & Moring LLP (Jeffrey L. Snyder, Matthew P. Jaffe, Alexander H. Schaefer, and Christopher E. Gagne), for Defendant-Intervenors.

**OPINION**

RIDGWAY, Judge:

This matter is before the Court following remand to the United States International Trade Commission.

In Celanese I, the Court sustained in part and remanded in part the Commission's negative preliminary injury determination in the antidumping investigation of polyvinyl alcohol ("PVA") imports from Taiwan. *See* Polyvinyl Alcohol from Taiwan, Inv. No. 731-TA-1088 (Preliminary), USITC Pub. 3732 (10/04) ("Preliminary Determination") (negative preliminary injury determination); Celanese Chemicals Ltd. v. United States, 31 CIT ____, 2007 WL 735024 (2007) ("Celanese I"). On remand, the Commission reconsidered various issues in light of the instructions in Celanese I, and reached an affirmative preliminary injury determination. *See* Polyvinyl Alcohol from Taiwan, Inv. No. 731-TA-1088 (Preliminary) (Remand), USITC Pub. 3920 (4/07) ("Remand Determination").

The Commission, joined by Celanese, urges that the agency's remand determination be sustained in its entirety. *See generally* Commission's Rebuttal Comments on Remand Determination at 1, 15 ("Commission Comments"); Comments of Celanese Chemicals Ltd. Regarding the U.S. International Trade Commission's Remand Determination at 3, 15-16 ("Pl.'s Comments"). In contrast, Defendant-Intervenors E.I. DuPont de Nemours & Co. and Chang Chun Petrochemical Co., Ltd. (collectively "DuPont") assert that the remand was improper *ab initio*, and that the Commission's original preliminary injury determination – the negative preliminary injury determination – should therefore be reinstated. *See generally* Defendant-Intervenors' Comments on the U.S. International Trade Commission's Remand Determination ("Def.-Ints.' Comments") at 1-11, 27. In the alternative, DuPont contends that the Commission failed to comply with the Court's instructions in Celanese I, and that the agency's findings on remand "lack any rational connection

to the facts." On those theories, DuPont requests that this matter be remanded to the Commission yet again, for further explanation and analysis. *See generally* Def.-Ints.' Comments at 1, 11-27.

Jurisdiction lies under 28 U.S.C. § 1581(c) (2000). For the reasons outlined below, the Commission's affirmative preliminary injury determination on remand must be sustained.

## I. Background

This action arises out of an antidumping petition against polyvinyl alcohol ("PVA") imports from Taiwan, filed by Celanese. In its preliminary injury investigation, the Commission found – by a three-to-two vote, with one Commissioner not participating[1] – that there was no reasonable indication that an industry in the United States was being materially injured or was threatened with material injury by reason of PVA from Taiwan. *See* Polyvinyl Alcohol from Taiwan, Inv. No. 731-TA-1088 (Preliminary), USITC Pub. 3732 (10/04) (negative preliminary injury determination). As a result, the investigation was terminated, in accordance with the statute. 19 U.S.C. § 1673b(a)(1).

Celanese responded by commencing this action contesting the Commission's negative preliminary determination. In Celanese I, the Court granted Celanese's Motion for Judgment Upon the Agency Record in part, and remanded the action to the Commission for further action. *See* Celanese Chemicals Ltd. v. United States, 31 CIT ____, 2007 WL 735024 (2007) ("Celanese I").[2]

---

[1]The Commission's majority opinion in the original investigation reflected the views of Vice Chairman Deanna Tanner Okun, as well as Commissioners Daniel R. Pearson and Charlotte R. Lane. Chairman Stephen Koplan and Commissioner Marcia E. Miller reached an affirmative determination. Commissioner Jennifer A. Hillman did not participate in the investigation.

[2]Specifically, the Commission was directed to: (1) explain why it relied on importer questionnaire responses, rather than import statistics collected by the U.S. Census Bureau, to measure the volume of subject imports; (2) explain why it relied on unadjusted import statistics

After considering the parties' comments on the issues remanded to the agency in Celanese I, and based on the information available at the time of the original preliminary determination, the Commission issued its remand determination. *See* Polyvinyl Alcohol From Taiwan, Inv. No. 731-TA-1088 (Preliminary) (Remand), USITC Pub. 3920 (4/07) ("Remand Determination").

On remand, the new Commission majority – consisting of three new Commissioners – reached an affirmative preliminary determination on injury, finding a reasonable indication that a domestic industry was being materially injured by imports of PVA from Taiwan allegedly being sold in the United States at less than fair value.[3] As required by the statute in situations where the Commission's composition has changed, the new Commissioners addressed the determination *de novo* and applied the proper statutory test to the record. *See* Trent Tube Div. v. United States, 14 CIT 780, 789, 752 F. Supp. 468, 476 (1990), *aff'd*, 975 F.2d 807 (Fed. Cir. 1992); Mitsubishi Materials Corp. v. United States, 20 CIT 328, 330, 918 F. Supp. 422, 425 (1996). The other three participating Commissioners (who constituted the majority in the original investigation) issued separate and dissenting remand views, again reaching a negative preliminary determination.

Where – as here – the Commission is "evenly divided," the statute specifies that "the Commission shall be deemed to have made an affirmative determination." 19 U.S.C. § 1677(11).

---

collected by Census to measure non-subject imports; (3) explain its finding of "attenuated competition" in the context of its underselling analysis; (4) reconsider its finding on price depression; (5) reconsider its finding on price suppression; (6) reconsider its finding on impact; and (7) reconsider its threat determination. Celanese I, 31 CIT at ____, ____, ____, ____, ____, ____, ____, 2007 WL 735024 at * 7-10, 10-11, 12-18, 19, 19-20, 20-23, 23-25; in particular, *see* Confidential Celanese Slip-Op 07-16 at 20-21, 24, 36-38, 41-42, 43-44, 49-50, 50-55.

[3]The three new Commissioners who constituted the majority were Vice Chairman Shara L. Aranoff, and Commissioners Irving A. Williamson and Dean A. Pinkert.

Thus, it is the affirmative preliminary determination on injury reached on remand which is now before the Court.

## II. Standard of Review

As all parties correctly emphasize, judicial review of preliminary determinations issued by the Commission is strictly limited. *See* Def.-Ints.' Comments at 2; Pl.'s Comments at 3-6; Commission Comments at 2-3. Indeed, *affirmative* preliminary determinations on injury are not independently appealable. Instead, upon receiving notice of an affirmative preliminary injury determination by the Commission, the U.S. Department of Commerce proceeds with its preliminary investigation into the existence of the alleged unfair trade practice (*i.e.*, dumping or subsidies). *See* 19 U.S.C. §§ 1671b(a), (b), & (f), 1673(a), (b), & (f). The Commission's affirmative injury determination is judicially reviewable only at some later date.

Moreover, although *negative* preliminary injury determinations may be appealed, Congress has prescribed a highly deferential standard for judicial review. Specifically, the statute requires that the Commission's determination be sustained, save where it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(A).

In a case such as this, the court's jurisdiction to review an affirmative preliminary injury determination reached on remand is "derived from the proper exercise of its jurisdiction" to review an appeal from a negative preliminary injury determination. Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1308-09 (Fed. Cir. 2004). Again, though, the scope of judicial review is quite narrow. As the Court of Appeals has underscored, the Commission's preliminary determination "must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law.'" *Id*. at 1309.  On the other hand, the court is not a "potted plant."[4]  *See* section III.A, *infra*.

### III.  Analysis

As a threshold matter, DuPont contends that "the . . . entire remand was inappropriate," and that "the Court therefore should reinstate the initial preliminary negative determination."  Def.-Ints.' Comments at 11; *see generally id*. at 1-11, 27.  In the alternative, DuPont charges that, even assuming that the remand was appropriate, the Commission failed to comply with the Court's instructions in Celanese I.  DuPont therefore seeks to have this matter remanded to the Commission for a second time.  *See generally* Def.-Ints.' Comments at 1, 11-14, 17.  A second remand is also warranted, according to DuPont, because the remand determination at issue here is assertedly "irrational, arbitrary and capricious."  *See generally* Def.-Ints.' Comments at 1, 14-27.

As discussed in greater detail below, however, all three of DuPont's arguments must fail.

### A.  The Propriety of the Remand in Celanese I

DuPont first mounts a broadbrush attack on the propriety of the remand in Celanese I.  According to DuPont,  "the . . . entire remand was inappropriate."  Def.-Ints.' Comments at 11.  DuPont contends that, in remanding the matter to the Commission, "the Court substituted its judgment for that of the ITC and thus strayed beyond the limits of its narrow review authority."  *Id*.

---

[4]In the course of congressional hearings on the Iran-Contra affair, chairman Daniel Inouye wearied of famed trial counsel Brendan Sullivan's objections to questions that were put to Mr. Sullivan's client, Oliver North.  Exasperated, Chairman Inouye suggested that Mr. North should speak for himself.  Mr. Sullivan famously responded: "Well, sir, I am not a potted plant.  I am here as the lawyer.  That's my job."

at 2. According to DuPont, "the Commission's initial determination featured a rational nexus between the facts on the record and the Commission's conclusions," and therefore should have been sustained. *Id*. at 11. DuPont concludes that "the Court . . . should reinstate the initial preliminary negative determination." *Id*. at 11; *see generally id*. at 1-11, 27.

DuPont's argument is ill-conceived, both as a matter of fact and as a matter of law. In Celanese I, the Court remanded issues in the Commission's determination that it found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* Celanese I, 31 CIT at ____, ____, ____, ____, ____, ____, ____, 2007 WL 735024 at * 5, 10, 11, 17-18, 19, 20, 22-23, 23-25. DuPont seems to fundamentally misconstrue that standard.

Like DuPont, the Commission too originally argued that the initial preliminary determination on injury (which was negative) should be sustained – a view which was rejected, in part, in Celanese I. It is telling that the Commission does not now join in DuPont's claim that the Court's remand to the agency in that decision reflected an incorrect application of the standard of review, and was improper.

DuPont's interpretation of the scope of judicial review would reduce the Court of International Trade to little more than a rubber stamp for agency decisionmaking. To the contrary, the court is entitled to require that the agency articulate the bases for its determinations in sufficient detail. The court is not obligated to defer to determinations where the agency's rationale cannot reasonably be discerned on review.

An arbitrary and capricious determination has been defined by the Supreme Court as a determination having no satisfactory explanation or rational connection between the facts found and

choices made. <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983) (*citing* <u>Burlington Truck Lines, Inc. v. United States</u>, 371 U.S. 156, 168 (1962)). As a reading of <u>Celanese I</u> makes plain, there were a number of issues in the Commission's original preliminary determination lacking the requisite satisfactory explanation or rational connection between the facts found and the choices made. Under the "arbitrary and capricious" standard mandated by Congress for judicial review of negative preliminary determinations, the Court was thus well within its rights to order a remand to the Commission on the specified issues, as illustrated generally in the discussion in section III.C, below.

### B. The Commission's Compliance With the Remand Instructions

DuPont further asserts that "[e]ven assuming *arguendo* that the Court's remand was appropriate, . . . the remand determination is unresponsive to the specific factual questions that the Court raised" in <u>Celanese I</u>. Def.-Ints.' Comments at 11. DuPont therefore argues, in the alternative, that the remand determination cannot be sustained, and that this matter should be sent back to the agency yet again. *See id*. at 1, 11-14 (and, more generally, 11-27). This claim too is lacking in merit.

As the Commission's Comments succinctly point out, "the [new] Commission majority was not required to explain findings it never made." Commission Comments at 3; *see generally* Commission Comments at 3-6; Pl.'s Comments at 8-9. And this is no *post hoc* rationalization. In reaching their remand determination, the majority Commissioners themselves explained:

> [T]he Court's instructions on remand are primarily directed to the substance of the Commission majority's Original Views in support of a preliminary negative

> determination. As a result of our affirmative preliminary remand determination, we
> do not need to address a number of the Court's remand instructions.

Commission Comments at 4 (*quoting* Remand Determination at 6; Remand Determination

(Confidential Version) at 7). In sum, to the extent that the remand instructions in Celanese I

required further explanation or analysis specific to the Commission's original negative preliminary

determination on injury, the affirmative preliminary injury determination on remand rendered those

instructions moot. *See* Mitsubishi Materials, 20 CIT at 330, 918 F. Supp. at 425 (holding that,

because certain Commissioners made a threat of injury determination, remand instructions

pertaining only to Commission's material injury finding did not apply to their determination).

Because the Commissioners who made up the new majority on remand were not involved

in the original investigation, DuPont errs in asserting that they should have explained what DuPont

terms the "reversal" of the Commission's earlier determination. Indeed, not only were they not

involved in the original investigation, they were not even Commissioners at that time. Thus, they

had no "position" from which to "change." Instead, in accordance with the law, they appropriately

made their remand determination *de novo*, by weighing the evidence and reaching their own

independent conclusions. *See* Mitsubishi Materials, 20 CIT at 330, 918 F. Supp. at 425 (observing

that those who "were not members of the Commission at the time of the original determination . .

. properly reviewed the case on remand *de novo*").

In a remand proceeding, Commissioners may adopt findings made in the original

determination, as they deem appropriate, and make them their own. USX Corp. v. United States,

12 CIT 844, 844-45 & n.3, 698 F. Supp. 234, 235-37 & n.3 (1988). The Commissioners comprising

the new majority in fact did adopt some findings from the original determination (*i.e.*, domestic like

product, domestic industry, and negligibility). However, they were not obligated to adopt or to defer to the methodologies employed in – much less the findings reached in – the original determination. *See* Trent Tube, 14 CIT at 789, 752 F. Supp. at 476 (in cases involving this "continuing institution, regardless of changes in [ ] membership," those newly participating in a remand proceeding comply with a remand order simply by "employ[ing] the proper statutory test to the record"); *cf*. Nippon Steel Corp. v. United States, 30 CIT 1229, 1238-40, 433 F. Supp. 2d 1336, 1344-46 (2006), *rev'd on other grounds*, 494 F.3d 1371 (Fed. Cir. 2007) (stating that the fact that a portion of the final determination on a previous remand was supported by substantial evidence "does not prevent the Commission from lawfully reaching a different conclusion on the same issue in a subsequent remand proceeding").

Contrary to DuPont's implication, the members of the Commission majority did not "reverse" their position on remand. Nor was there any requirement that they "reconcile" their analysis with, or adopt the methodology of or the findings from, the original negative preliminary determination at issue in Celanese I. Having properly reviewed the record *de novo* and having reached an affirmative preliminary injury determination based thereon, the majority Commissioners were under no obligation to respond to remand instructions that pertained solely to a negative preliminary determination.

### C. The Adequacy of the Commission's Remand Determination

DuPont maintains that, "[e]ven assuming that (1) the Court's remand was appropriate and (2) the Commission addressed the issues the Court identified, any review of the record evidence demonstrates that the Commission's remand determination is irrational, arbitrary and capricious."

Def.-Ints.' Comments at 14.  Thus, the final issue is whether the new Commission majority's analysis of (1) the volume of subject imports, (2) the price effects of subject imports, and (3) the impact of subject imports on the domestic industry was arbitrary and capricious, as DuPont contends.  *See generally* Def.-Ints.' Comments at 1, 14-27.[5]

As summarized below, a review of the record confirms that there was a rational nexus between the facts found and the choices made by the majority on remand.  DuPont has failed to make its case to the contrary.  The new Commission majority adopted certain undisputed findings from the original preliminary determination, as noted above.  DuPont does not challenge their analysis of the relevant conditions of competition.  After explaining their choice of data sets to measure the volume of subject and non-subject imports (also undisputed – *see* section III.C.1, below), the new Commission majority concluded that the volume and the increase in volume of the subject imports from Taiwan was significant.  As they explained, the volume of subject imports increased both absolutely and relative to apparent U.S. consumption over the period of investigation, most notably as imports previously found to be injurious began to leave the market from 2002 to 2003 and into 2004.  DuPont's disagreement with the new majority's volume analysis is limited to its argument that they did not draw the conclusions that it would have preferred concerning the price effects and impact of subject imports, discussed in sections III.C.2 and III.C.3 below.

---

[5]The Commission is directed to determine, "based on the information available to it at the time of the determination, whether there is a reasonable indication that – (A) an industry in the United States – (i) is materially injured, or (ii) is threatened with material injury . . . by reason of imports of the subject merchandise."  19 U.S.C. § 1673b(a)(1).  Here, because the new Commission majority found present injury, there was no need for it to reach the issue of the threat of injury, and it did not do so.

DuPont's remaining arguments reflect little more than its disagreement with the new Commission majority's weighing of the evidence, and its contention that the record did contain clear and convincing evidence of no material injury or threat thereof by subject imports under American Lamb. *See generally* Commission Comments at 7 (*citing* American Lamb Co. v. United States, 785 F.2d 994, 1003-04 (Fed. Cir. 1986)). However, that DuPont would have preferred that the new Commission majority weigh the evidence differently so as to reach a negative determination – as the Separate and Dissenting Commissioners did – does not detract from the validity of the affirmative preliminary determination on injury that the new majority reached on remand. That determination must therefore be sustained.

### 1.  The Volume of Imports

Under the statutory scheme, in evaluating the volume of imports of subject merchandise, the Commission must determine "whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."  19 U.S.C. § 1677(7)(C)(i).

In its original preliminary determination, although the Commission found the actual volume of subject imports and the increase in that volume over the period of investigation ("POI") to be significant, it nevertheless found that volume did not have a significant impact on the domestic market.  *See generally* Celanese I, 31 CIT at ____, 2007 WL 735024 at * 7.  The Commission further determined that non-subject imports, *i.e.*, imports from countries other than Taiwan, had a negligible impact on the domestic PVA industry.  *See generally id*., 31 CIT at _____, 2007 WL 735024 at * 10.

a.  The Basis for the Remand in Celanese I

Celanese disputed the data on which the Commission relied to calculate the volume of subject and non-subject imports and their respective market shares, as well as the domestic industry's market share performance, asserting that the Commission both understated the volume of subject imports and overstated the volume of non-subject imports. *See generally* Celanese I, 31 CIT at ____, 2007 WL 735024 at * 10.

To determine the volume of subject imports, the Commission relied on importer questionnaire data, rather than U.S. Census statistics, citing inaccuracies in the Census statistics. *See* Celanese I, 31 CIT at ____, 2007 WL 735024 at * 7-8.  However, Celanese maintained that corrected Census statistics were available and more reliable, and that the importer questionnaire data were incomplete. *See id*., 31 CIT at ____, 2007 WL 735024 at * 7-9.

Celanese I acknowledged that the Commission's calculation of the volume of subject imports using importer questionnaire data (as opposed to other data sources) is generally within the agency's discretion. *See generally* Celanese I, 31 CIT at ____, 2007 WL 735024 at * 7-8 (and authority cited there).  However, the Commission failed to provide any response to allegations that the questionnaire data were incorrect, or to provide a rational explanation for the use of those data, except to say that relevant U.S. Census statistics were not correct. *See generally* Celanese I, 31 CIT at ____, 2007 WL 735024 at * 9.  The Commission was therefore instructed, on remand, to "explain why the questionnaire responses remained the best information available in light of the apparent corrections to the errors which were cited as reasons for not using Census data in the first instance." Celanese I, 31 CIT at ____, 2007 WL 735024 at * 10.

Celanese also objected to the Commission's use of certain unadjusted Census data to calculate the volume of non-subject imports. *See generally* <u>Celanese I</u>, 31 CIT at ____, 2007 WL 735024 at * 10. Those data covered PVA of all hydrolysis levels, while the scope of the investigation at issue includes only PVA with an hydrolysis level of 80% or higher. *Id*., 31 CIT at ____, 2007 WL 735024 at * 10. Celanese contrasted the Commission's practice in the case at bar with the agency's practice in the parallel investigations of PVA from China, Japan, and Korea, where the Commission adjusted the Census data to exclude non-subject PVA. *See generally id*., 31 CIT at ____, 2007 WL 735024 at * 10. Celanese argued that "by using data that included out-of-scope products[,] the Commission overstated the volume of non-subject imports which contributed to understating the impact on the domestic market of subject imports from Taiwan." *Id*., 31 CIT at ____, 2007 WL 735024 at * 10.

The Commission's original preliminary determination characterized the out-of-scope imports as a "relatively small share"; but it provided no justification for the inclusion of such imports in the non-subject import data, and failed to explain why the Commission had not adjusted the data in this case as it had in the parallel investigations. *See generally* <u>Celanese I</u>, 31 CIT at ____, 2007 WL 735024 at * 10-11. The Commission was therefore instructed, on remand, to explain the basis for the difference in its practices in parallel investigations, and to provide support for its conclusion that the volume of out-of-scope, non-subject imports included in Census data used in its calculations would not affect the outcome of the agency's determination. *See generally* <u>Celanese I</u>, 31 CIT at ____, 2007 WL 735024 at * 11 .

b.  The Remand Determination

On remand, the Commission – including both the new Commission majority and the dissenting Commissioners – explained that the agency in fact did not have final, corrected Census data available for use in determining the volume of subject imports.  Contrary to Celanese's representations, the Census Bureau had not provided the agency with revised data.  The Commission noted that, although DuPont provided information correcting its own import data to the Commission and to Census, there was no indication on the record "when or even if Census concurred with DuPont's revision."  The Commission chose not to rely on data that had not been verified by Census, and concluded that the importer questionnaire data were the best information available to the agency under the circumstances.  *See generally* Remand Determination at 10; Remand Determination (Confidential Version) at 12-13; *see also* Pl.'s Comments at 6-7**;** Commission Comments at 6-7; Def.-Ints.' Comments at 11.

On remand, the Commission also addressed the issue of the use of unadjusted Census data in determining the volume of non-subject imports.  The Commission – including both the new Commission majority and the dissenting Commissioners – explained that the agency had lacked sufficient time to adjust the data to exclude out-of-scope non-subject imports in reaching its original preliminary injury determination, and that it had made such adjustments only in the final phases of the parallel investigations of PVA from China, Japan, and Korea.  With the benefit of the additional time on remand, the Commission made the appropriate adjustments, as reflected in the Remand Determination. *See generally* Remand Determination at 9-11; Remand Determination (Confidential Version) at 12-13; *see also* Pl.'s Comments at 7-8; Def.-Ints.' Comments at 11.

No party, including DuPont, contests the new majority's treatment of the volumes of subject and non-subject imports in the Remand Determination – or, for that matter, any other specific aspect of the new majority's volume analysis.  The new Commission majority found that the volume of subject imports increased both absolutely and relatively over the period of investigation, and that the increases were "sharpest from 2002 to 2003 and into 2004," when PVA imports from China, Japan, and Korea – the countries subject to antidumping orders entered in 2003 – began to leave the U.S. market.  *See* Remand Determination at 18, 19; Remand Determination (Confidential Version) at 24, 26.  The new majority concluded that these increases were significant.  Remand Determination at 19; Remand Determination (Confidential Version) at 26.  Given the record facts, that is a rational conclusion.  *See generally* Pl.'s Comments at 9-10.

## 2.  The Price Effects of Subject Imports

The statute further requires that the Commission evaluate the price effects of the subject imports.  Specifically, the Commission must consider whether there is significant price underselling, and whether the subject imports have otherwise depressed prices significantly or prevented price increases to a significant degree.  19 U.S.C. § 1677(7)(C)(ii).

## a.  Underselling and Attenuated Competition

In its original preliminary determination, the Commission found attenuated competition between domestic and imported PVA.  The Commission further concluded that any underselling by subject imports was not significant.  *See generally* Celanese I, 31 CIT at ____, 2007 WL 735024 at * 12-13.

(1)  The Bases for the Remand in Celanese I

Celanese challenged the Commission's finding of attenuated competition, as well as its conclusion that any underselling of subject imports was insignificant.  Celanese asserted the Commission had changed methodologies from the 2003 investigation, giving decisive weight to the alleged lack of competition overlap in the current investigation, and dismissing allegations of lost sales and revenues (which were cited as dispositive bases for finding significant underselling in another investigation).

Celanese further alleged that the Commission downplayed the underselling observed with a particular product (product 4) by stating the volume of that product was [

    ].  Celanese argued that the data showed that the volume [

                    ].  Celanese also asserted that the Commission erred in minimizing a significant instance of a confirmed lost sale, challenging the agency's statement that  the lost sale occurred during a period of decreasing imports.  In addition, Celanese objected to the weight accorded by the Commission to factors other than price in the agency's analysis of lost sales and lost revenues.  *See generally* Celanese I, 31 CIT at ____, 2007 WL 735024 at * 16-17.

In Celanese I, the Court acknowledged that the scope of judicial review for a preliminary injury determination is narrow, and that the Commission is entitled to utilize any number of methodologies to perform its duties.  The Court further noted the right of the agency to weigh the evidence before it, and to give dispositive weight to certain facts over others.  However, the agency must explain the reasons behind its determination.  Bowman Transp., Inc. v. Arkansas-Best Freight System, 419 U.S. 281,  285-86 (1974); Motor Vehicle Mfrs. Ass'n.,  463 U.S. at  43.  Further, there

is a general rule that an "agency must either conform itself to its prior decisions or explain the reasons for its departure." Citrosuco Paulista, S.A. v. United States, 12 CIT 1196, 1209, 704 F. Supp. 1075, 1088  (1988) (*citing* Sec'y of Agric. v. United States, 347 U.S. 645 (1954)). *See generally* Celanese I, 31 CIT at ____, 2007 WL 735024 at * 16.

Celanese I directed the Commission to further explain its finding of attenuated competition, as well as its determination that any underselling was insignificant. *See generally* Celanese I, 31 CIT at ____, 2007 WL 735024 at * 18.

### (2)  The Remand Determination

On remand, the Commissioners examined the price effects of the subject imports by evaluating the same five product lines as in the original preliminary determination.  However, the new Commission majority reached a conclusion very different from that in the original preliminary determination.  Specifically, the new majority concluded that there was significant underselling. As the Commission properly noted, the remand instructions in Celanese I were "primarily directed to the substance of the Commission majority's Original Views in support of a preliminary negative determination."  The new Commission majority therefore "did not need to address a number of the Court's remand instructions," including those related to the earlier determination's findings on attenuated competition and underselling.  *See generally* Remand Determination at 6; Remand Determination (Confidential Version) at 7.

In analyzing underselling, the new Commission majority examined pricing data that all parties agreed were representative of the quarterly selling prices of domestic products and subject imports.  They found that prices fluctuated during the period of review, but trended downward

overall.  As the new majority explained, they placed greater weight on the pricing data for the most recent portion of the period of review, which is when the volume of non-subject imports was declining and the volume of subject imports from Taiwan was increasing.  In that period, subject imports from Taiwan undersold the domestic like product in 13 out of 30 instances, with a significant range in the margin of underselling.  Accordingly, the new Commission majority found significant underselling by subject imports from Taiwan.  *See* Remand Determination at 21; Remand Determination (Confidential Version) at 29; *see generally* Commission Comments at 8; Pl.'s Comments at 11.

DuPont asserts that the new Commission majority failed to examine the pricing data by period, instead looking "only" at changes from the beginning to the end of the period of investigation.  *See* Def.-Ints.' Comments at 16.  Although the new majority did examine price changes from the beginning to the end of the period of review, they emphasized that the pricing data for the most recent periods (when the volume of non-subject imports was receding, and the volume of subject imports from Taiwan was increasing) weighed more heavily in their analysis.  In particular, for product 4, subject imports undersold the domestic like product for five of the six most recent quarters, with a significant range in the margin of underselling.  Subject imports undersold for product 2 for the second quarter of 2004, and for product 3 for the fourth quarter of 2003 as well as the second quarter of 2004.  Subject imports undersold for product 5 for five of six recent quarters, at disparate underselling margins.  *See* Remand Determination at 21 n.136; Remand Determination (Confidential Version) at 29 n.136; *see generally* Commission Comments at 8-9.

And, as DuPont itself acknowledges, the Commission has broad discretion in determining the weight to be accorded data in its analysis. *See* Def.-Ints.' Comments at 3.

DuPont also mistakenly argues that the new Commission majority failed to examine pricing data on a firm-specific basis by period on remand. *See* Def.-Ints.' Comments at 16. The Commission is not obligated to examine pricing data on a disaggregated basis, because the statute requires it to analyze injury on an industry-wide basis. *See* 19 U.S.C. § 1673b(a); Hynix Semiconductor, Inc. v. United States, 30 CIT 1208, 1215-17, 431 F. Supp. 2d 1302, 1311-12 (2006). In any event, the new Commission majority in fact also examined the pricing data on a firm-specific basis. In particular, the new majority indicated that, in any final phase investigation, they would more closely examine certain relevant data. They also stated their intent to examine the price effects associated with a recent surge of imports. *See* Remand Determination at 21 & n.135; Remand Determination (Confidential Version) at 27-29 & n.135; *see generally* Commission Comments at 9. Contrary to DuPont's suggestion, the fact that the new Commission majority chose not to give dispositive weight to certain data does not in any way establish that its analysis was "arbitrary or capricious."

DuPont further asserts that the new Commission majority should have examined the pricing data by market segment by period. *See* Def.-Ints.' Comments at 16, 17-19. DuPont's argument fails to recognize that the new majority's analysis of quarterly pricing data was consistent with the Commission's normal methodology, and thus presumptively reasonable and entitled to deference. *See* Hynix, 30 CIT at 1215-16, 431 F. Supp. 2d at 1311; U.S. Steel Group v. United States, 96 F.3d 1352, 1357-58, 1361-62 (Fed. Cir. 1996) (explaining that the Commission's analytical and

methodological choices need only be reasonable ones); *see generally* Commission Comments at 9-10.

In addition, DuPont faults the new Commission majority for failing to find "attenuated competition" between the subject imports and the domestic like product based on a market segment analysis and an examination of "top ten customers" and because DuPont disagrees with how the new majority weighed evidence of lost sales and revenues. *See* Def.-Ints.' Comments at 17-19. But it appears that the new Commission majority simply was not comfortable making an assessment that competition was "attenuated" based on the record at this relatively early stage of the investigation. Indeed, the members of the new Commission majority expressed their intent to collect data in any final phase investigation about the extent of competition between subject imports and the domestic like product, as well as the extent to which various types of PVA are interchangeable. *See* Remand Determination at 23 n.147; Remand Determination (Confidential Version) at 32 n.147. Similarly, the new Commission majority noted that "Staff received no responses to many of the [lost sales and revenue] allegations" and would continue efforts to verify them in any final phase investigation. *See* Remand Determination at 22 n.142; Remand Determination (Confidential Version) at 30 n.142. The new majority also noted plans to explore the role of non-price factors, including – in addition to the fungibility of various types of PVA – "why purchasers may have shifted to subject imports from the domestic like product and whether purchasers seek multiple supply sources." *See* Remand Determination at 23 n.147; Remand Determination (Confidential Version) at 32 n.147; *see generally* Commission Comments at 10.

It is the statutory role of the Commission to determine whether the evidence is inadequate to show a reasonable indication of material injury or threat of injury to the domestic industry by reason of subject imports, and whether the evidence that the domestic industry is not harmed by imports is clear and convincing. 19 U.S.C. § 1673b(a)(1); American Lamb, 785 F.2d at 1004. DuPont's criticisms of the new Commission majority's finding of significant underselling are no more than an improper request that the Court re-weigh the evidence and make its own American Lamb assessment. The new majority's finding of significant underselling is both rational and supported by ample evidence in the record.

### b. Price Depression

In determining the price effects of subject imports, the Commission is charged under the statute with ascertaining whether "the effect of imports of such merchandise otherwise depresses prices to a significant degree." 19 U.S.C. § 1677(7)(C)(ii)(II). In its original preliminary determination, the Commission found no price depression attributable to subject imports from Taiwan. *See generally* Celanese I, 31 CIT at ____, 2007 WL 735024 at * 19.

### (1) The Bases for the Remand in Celanese I

In its original preliminary determination, the Commission stated that – while PVA prices did decline in the U.S. market – those declines occurred largely in the early portion of the period of investigation, when subject imports from Taiwan were declining. The Commission further stated that "[g]enerally prices began to increase or stabilized during the latter part of the period of

investigation, notwithstanding an increase in the volume of subject imports between 2002 and 2003." *See generally* <u>Celanese I</u>, 31 CIT at \_\_\_\_, 2007 WL 735024 at * 19.

Celanese took strong exception to the Commission's characterization of the data. Indeed, as <u>Celanese I</u> noted, the "evidence seems to indicate that [the prices] were flat or even decreasing" during the end of the period of investigation. *See* <u>Celanese I</u>, 31 CIT at \_\_\_\_, 2007 WL 735024 at * 19. Citing specific prices by product, the Court remanded the determination to the Commission with instructions to explain any apparent contradictions and inconsistencies between the evidence and its finding that prices were not declining at the end of the period of investigation. *See* <u>Celanese I</u>, 31 CIT at \_\_\_\_ n.19, 2007 WL 735024 at * 19 n.19.

(2)  <u>The Remand Determination</u>

On remand, the new Commission majority agreed with the Court's observations in <u>Celanese I</u>, and found significant price depression during the period of investigation. *See generally* Remand Determination at 21; Remand Determination (Confidential Version) at 29. The new majority noted that prices for all U.S. products, except product 5, were lower at the end of the period than at the beginning, while prices for all Taiwan products, including product 5, were lower at the end of the period than at the beginning. The new majority acknowledged that from 2001 to mid-2003, "the downward pressure on U.S. prices was caused in part by dumped imports from China, Japan, and Korea" and that subject imports from Taiwan "often oversold the domestic like product." *See* Remand Determination at 22; Remand Determination (Confidential Version) at 30. At the same time, the new majority pointed to the continued increase in subject imports from Taiwan after orders

were imposed on China, Japan, and Korea, and the fact that "U.S. prices did not recover."  *See id*.;
*see generally* Commission Comments at 11; Pl.'s Comments at 12-13.

In assessing the record evidence, the new Commission majority emphasized that there were
"multiple examples that directly link[ed] the pricing of subject imports to the observed downward
price pressure in the U.S. market," including confirmed lost sales and lost revenue allegations, as
well as evidence that seven of 17 purchasers shifted purchases of PVA from U.S. sources to Taiwan
(four for price reasons).  The new majority also pointed to statements from 10 of 17 purchasers that
indicated that their U.S. source had reduced its prices to compete with subject imports from Taiwan.
*See* Remand Determination at 22; Remand Determination (Confidential Version) at 30; *see generally*
Commission Comments at 11-12; Pl.'s Comments at 12-13.

The new Commission majority found the record inconclusive as to the effect, if any, of
Celanese's allegedly flawed pricing strategy, and indicated that, in the future, they would seek
additional data concerning domestic producers' business practices.  They found that domestic
producers lowered prices to retain market share, in response to pricing pressure from subject
imports; and they concluded that subject imports depressed U.S. prices, particularly after the non-
subject imports left the U.S. market.  *See* Remand Determination at 21-23; Remand Determination
(Confidential Version) at 29-32; *see generally* Commission Comments at 12; Pl.'s Comments at 12-
13.

DuPont mistakenly claims that the new Commission majority did not examine trends in the
pricing data by pricing product, requests (in effect) that the Court re-weigh the evidence, asserts that
the new Commission majority should have applied DuPont's preferred market-segment

methodology, and insists that the new Commission majority should have found "attenuated competition" between domestic and subject products. *See* Def.-Ints.' Comments at 20-24. DuPont's challenges to the new Commission majority's price depression analysis thus echo many of the same arguments it advanced in its challenge to the Commission's finding on underselling, and fail for the same reasons. *See generally* Commission Comments at 12.

DuPont further insists that the new Commission majority "paid no regard to the fact that most of the declines in PVA prices in the U.S. occurred during the first two years of the POI." *See* Def.-Ints.' Comments at 21. However, the new majority clearly rejects that view, noting that the volume of subject imports continued to increase after imports from China, Korea, and Japan became subject to order, and that "U.S. prices did not recover" as a result of subject imports. *See* Remand Determination at 22; Remand Determination (Confidential Version) at 30. In addition, DuPont alleges that the new Commission majority failed to analyze demand factors in making its determination. *See* Def.-Ints.' Comments at 23. On the contrary, the new majority expressed their view that additional information was needed to evaluate "factors other than imports that may have affected U.S. producers' ability to raise prices and recover costs." *See* Remand Determination at 14, 22, 23 n.147; Remand Determination (Confidential Version) at 17-18, 30, 32 n.147. And the Commission has the prerogative under American Lamb to conclude that it is necessary to conduct a final investigation to fully analyze these issues. *See generally* Commission Comments at 12-13.

c. Price Supression

In determining the price effects of subject imports, the statute further requires that the Commission analyze whether "the effect of imports of such merchandise . . . prevents price

increases, which otherwise would have occurred, to a significant degree." 19 U.S.C. §

1677(7)(C)(ii)(II). In its original preliminary determination, the Commission found there was no

price suppression by subject imports from Taiwan. *See generally* Celanese I, 31 CIT at ____, 2007

WL 735024 at * 19.

(1)  The Bases for the Remand in Celanese I

In its original preliminary determination, the Commission stated that there was evidence that

the domestic industry suffered a cost-price squeeze.[6]  The Commission also found that cost of goods

sold ("COGS") as a ratio to sales declined in the early portion of the POI, but increased between

2002 and 2003 as the increases in prices in the U.S. market were unable to fully keep pace with

increasing costs.  However, the Commission stated that there was no reasonable indication that

subject imports from Taiwan were responsible for the cost-price squeeze.  Instead, the Commission

pointed to evidence that there was more overselling at the end of the period of investigation, when

subject import volume was rising, and that cost factors other than subject imports were responsible

for important adverse effects on prices during the period of review.  *See generally* Celanese I, 31

CIT at ____, 2007 WL 735024 at * 20.

Celanese objected to the Commission's finding that certain individual cost factors were

responsible for the cost-price squeeze and not the subject imports, on the ground that there was no

rational explanation by the Commission for the connection between company cost factors and the

---

[6]A cost-price squeeze occurs when the cost of goods sold ("COGS") exceeds price and the producer is unable to raise the price - that is, when the producer is unable to sell the good for more than it costs to produce it. *See generally* Nippon Steel Corp. v. United States, 458 F.3d 1345, 1354 (Fed. Cir. 2006).

Commission's finding of a lack of price suppression. The Court remanded the price suppression analysis to the agency, "to allow the Commission to further explain the connection between cost structure factors and its finding of no price suppression . . . [and to] reconsider its findings on price suppression . . . , in light of any new conclusions it may reach on volume." *See generally* Celanese I, 31 CIT at ____, 2007 WL 735024 at * 20.

## (2)  The Remand Determination

One would ordinarily expect that prices would have risen as costs rose, with demand steady or rising, and as imports from China, Korea, and Japan became subject to the discipline of orders. However, based on their analysis of the available evidence, the new Commission majority found on remand that there was significant price suppression – that is, that PVA imports from Taiwan prevented price increases that otherwise would have occurred to a significant degree. *See generally* Remand Determination at 23; Remand Determination (Confidential Version) at 31-32. Specifically, the new majority concluded that "U.S. producers could not raise their prices sufficiently to recover increasing costs despite steady or rising demand." *See* Remand Determination at 23; Remand Determination (Confidential Version) at 32. The record amply supports that conclusion. *See generally* Commission Comments at 13; Pl.'s Comments at 13.

For example, the record evidence documents that the price of gas – a significant cost for the production of PVA in the U.S. – rose from a low of $3.58 per Mcf in the last quarter of 2003, to $6.30 per Mcf in the first half of 2004. *See* Remand Determination at 23 n.144; Remand Determination (Confidential Version) at 31 n.144. Other relevant supporting data include statistics on the rising unit costs of production throughout the period of review, and corresponding data on

unit sales value, as well as the ratio of unit cost of goods sold to unit sales value. *See* Remand Determination at 23 n.146; Remand Determination (Confidential Version) at 32 n.146. Based on these and other record data, the new Commission majority's preliminary determination that there was significant price suppression must be upheld as rational. *See generally* Pl.'s Comments at 13-14.

DuPont recycles once again its erroneous claim that the new Commission majority "reversed" course, and insists that the new majority turned a blind eye to evidence of other factors that might explain away any price suppression. *See* Def.-Ints.' Comments at 24-25. Quite to the contrary, the new Commission majority expressly acknowledged the factors that DuPont asserts were ignored; and, indeed, the new majority indicated their desire to seek additional data on "factors other than imports that may have affected U.S. producers' ability to raise prices and recover costs." *See* Remand Determination at 23 n.147, 25; Remand Determination (Confidential Version) at 32 n.147, 34-35 (reflecting future plans of new Commission majority to "explore more fully . . . other factors such as sharply rising energy costs" and other obvious factors that may account for differences, "such as production methods and pricing strategies"). DuPont simply disagrees that more complete consideration of such issues can properly be deferred to a final phase investigation. *See generally* Commission Comments at 14.

### 3. The Impact of Subject Imports

In analyzing the impact of subject imports, the statute directs the Commission to "evaluate all relevant economic factors which have a bearing on the state of the industry in the United States." 19 U.S.C. § 1677(7)(C)(iii). Such factors include output, sales, market share, profits, productivity,

return on investments, capacity utilization, cash flow, inventories, employment, wages, growth, ability to raise capital, and investment. 19 U.S.C. § 1677(7)(C)(iii). Further, the Commission is to consider all relevant economic factors "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii).

In its original preliminary determination, the Commission found no reasonable indication that subject imports had an adverse impact on the domestic industry. The Commission noted that the domestic industry's operating margin had declined between 2002 and 2003, and then stabilized from interim 2003 to interim 2004; and the Commission acknowledged that "subject imports from Taiwan may have contributed to [the decline]." However, the Commission declined to find that subject imports contributed materially to the decline in the domestic industry's operating margins or other performance factors. Instead, the Commission attributed the poor performance of the domestic PVA industry to cost structure differences and various other factors. *See generally* Celanese I, 31 CIT at ____, 2007 WL 735024 at * 20-22.

### a. The Bases for the Remand in Celanese I

Celanese charged that the Commission's use of a cost structure comparison as part of the impact analysis was arbitrary, given that the Commission had not used such a methodology in the 2003 investigation. Although the Court rejected that argument, it agreed with Celanese that it was arbitrary for the Commission, without explanation, to point to other factors to support its finding on the absence of an adverse impact. Celanese I thus sustained the Commission's impact analysis to the extent that it was based on cost structure differences. But the Commission was instructed on

remand to elaborate on the alleged negative profitability trend which was cited as a basis for the Commission's conclusions. *See generally* Celanese I, 31 CIT at ____, 2007 WL 735024 at * 22-23.

### b. The Remand Determination

In contrast to the Commission's original determination, the new Commission majority concluded on remand that, in fact, subject imports did have a "significant adverse impact" on the U.S. industry. *See* Remand Determination at 24; Remand Determination (Confidential Version) at 33. The Commission's finding on remand thus obviated the need for the agency to respond to the instructions in Celanese I, which were directed toward the agency's original negative preliminary determination.

Specifically, the new majority found that the increasing volume of subject imports, at prices which undersold the domestic like product, depressed and suppressed domestic prices, and negatively impacted the financial performance of the weakened domestic industry. The majority found that subject imports from Taiwan "continued and even exacerbated the injury caused by the previous unfairly traded imports and prevented the [domestic] industry from raising its prices sufficiently to cover rising costs and expenses and [to] improve its performance." The majority further took note of the domestic industry's performance in 2001 and 2002 (when imports from China, Japan, and Korea were still in the U.S. market), as compared to the trend in 2003 and the first half of 2004, as imports from Taiwan increased in the market as other imports receded. *See generally* Remand Determination at 24-25; Remand Determination (Confidential Version) at 33-34; Commission Comments at 14; Pl.'s Comments at 14-15.

DuPont contends that the new Commission majority failed to account for certain differences between domestic producers, the fact that some of the industry's performance indicators improved at the end of the period of review, and the domestic industry's exporting activities. *See* Def.-Ints.' Comments at 25–27. But each of DuPont's arguments is belied by the factors cited by the new Commission majority in the Remand Determination, such as their review of differences between several of the domestic producers and the extent to which the domestic industry's performance factors fluctuated. *See* Remand Determination at 24-25; Remand Determination (Confidential Version) at 33-35; Commission Comments at 14-15.

The record facts catalogued by the new Commission majority include information such as operating profit/loss data for commercial shipments in 2001, 2002, and interim 2003 and 2004; the operating ratios for the same periods; and statistics documenting the diminishing employment of production workers for shipments in the commercial markets during the relevant periods. *See* Remand Determination at 24-25; Remand Determination (Confidential Version) at 33-35; Pl.'s Comments at 15. Facts such as these establish the requisite nexus between the record evidence and the conclusions drawn by the new Commission majority in the Remand Determination.

## IV.  <u>Conclusion</u>

For the reasons set forth above, the International Trade Commission's affirmative preliminary injury determination, reached on remand, must be sustained.  *See* Polyvinyl Alcohol from Taiwan, Inv. No. 731-TA-1088 (Preliminary) (Remand), USITC Pub. 3920 (4/07).  Judgment shall enter accordingly.


                                        /s/ Delissa A. Ridgway
                                 _____
                                         Delissa A. Ridgway
                                              Judge


Decided:    November 19, 2008
            New York, New York